Ryan T. Earl, ISB #8342
Earl and Earl, PLLC
Attorney at Law
17 12th Avenue South Suite 203
Nampa, Idaho 83651
ryantearlattorneyatlaw@yahoo.com
Telephone: 208-318-8449
Facsimile:  208-465-6156

Plaintiff's Attorney

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| JEREMIAH B. SCHMIDT,<br>JESS TRONSON, AND<br>IGNACIO TELLEZ | ) )<br>)<br>) | |
| Plaintiffs, | )<br>) | Case No: 1:14-cv-00242 |
| v. | )<br>)<br>)<br>) | PRISONERS VERIFIED CIVIL<br>RIGHTS COMPLAINT<br>UNDER 42 U.S.C. 1983 |
| | )<br>) | JURY TRIAL DEMANDED |
| Idaho Department of Corrections,<br>Warden Randy Blades,<br>Correctional Officer Roberto G. Escobedo,<br>Correctional Officer Tramel. | )<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## I. INTRODUCTION

1.1 This is a civil rights action filed by Jeremiah Schmidt, Jess Tronson, and Ignacio

Tellez, state prisoners, for damages and injunctive relief under 42 U.S.C. 1983,

alleging deliberate indifference, cruel and unusual punishment, sexual assault, failure to protect and violations under Prison Rape Elimination Act ("P.R.E.A.")

## II. JURISDICTION AND VENUE

2.1 This action arises under the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1343(a), (3) and (4). Venue is proper pursuant to 28 U.S.C. §1391(b), in that all Plaintiffs reside, and Plaintiffs' claims arose, within the District.

## III. PARTIES TO THIS ACTION

3.1 Plaintiff Jeremiah Schmidt, is an adult citizen of the United States and a prisoner, incarcerated under the jurisdiction and control of the Idaho Department of Corrections (IDOC). Plaintiff, during the time of this complaint and cause of action was incarcerated at Idaho State Correctional Institution (ISCI) and under the care and custody of Warden Randy Blades and Idaho Department of Corrections.

3.2 Plaintiff Jess Tronson, is an adult citizen of the United States and is a prisoner, incarcerated under the jurisdiction and control of the Idaho Department of Corrections (IDOC). Plaintiff, during the time of this complaint and cause of action was incarcerated at Idaho State Correctional Institution (ISCI) and under the care and custody of Warden Randy Blades and Idaho Department of Corrections.

3.3 Plaintiff Ignacio Tellez, is an adult citizen of the United States and is a prisoner, incarcerated under the jurisdiction and control of the Idaho Department of Corrections (IDOC). Plaintiff, during the time of this complaint and cause of action was incarcerated at Idaho State Correctional Institution (ISCI) and under the care and custody of Warden Randy Blades and Idaho Department of Corrections.

3.4 Defendant, Idaho Department of Corrections, (hereinafter IDOC), is responsible for the incarceration and community supervision of felony offenders in Idaho. IDOC operates eight prisons, four community work centers and numerous probation and parole offices. IDOC is responsible for training and supervising the employees it entrusts to care for those sentenced to its custody. They also are responsible for enforcing and implementing the Prison Rape Elimination Act (P.R.E.A.) for which they receive federal funding. IDOC's address of business is 1299 Orchard Street Suite 110 Boise, Idaho 83706

3.5 Defendant, Warden Randy Blades, is the Warden at the Idaho State Correctional Institution (hereinafter ISCI.) He is responsible for and has a duty to protect inmates entrusted into his care, as well as supervise and train those who are employed to work under him. His regular place of business at all times during the misconduct of this complaint is ISCI located at 13900 S. Pleasant Valley Rd Boise, Idaho 83707.

3.6 Defendant, Correctional Officer Tramel, is employed as a Correctional Officer at ISCI. He is responsible for and has a duty to protect those inmates whom he supervises. During and after the issues of fact in this action Defendant Tramel did verbally threaten the plaintiffs in attempt to have them recant their testimony and charges against Defendant Roberto Escobedo, in an attempt to save his friend from humiliation and criminal prosecution. His regular place of business is ISCI located at 13900 S. Pleasant Valley Rd Boise, Idaho 83707.

3.7 Defendant, Correctional Officer Roberto Escobedo, was, at all times during the conduct of this complaint, employed as a Correctional Officer at ISCI. He was trained to be responsible for and had a duty to protect those inmates whom he supervised. Officer

Roberto Escobedo is prohibited under the P.R.E.A., from sexually assaulting, molesting, groping, grooming, coercing, stalking and any other form of sexual conduct toward any inmate entrusted into his care. As shown by the facts of this case he breached his duty and did sexually assault the plaintiffs and threaten them, by using the power of his position over them. His regular place of business during this misconduct was ISCI located at 13900 S. Pleasant Valley Rd Boise, Idaho 83707.

### IV. FACTS OF THE CASE

4.1    Jeremiah Schmidt is a 25 year old male.  Mr. Schmidt arrived at the IDOC facility of ISCI on or about April 26, 2012.   His first interaction with Plaintiff Correctional Officer Roberto Escobedo (herein Officer Escobedo), was in May of 2012, when he moved into Unit 13.  Officer Escobedo stated to Mr. Schmidt as he was moving in "how lucky did you get to move in to Unit 13?"   After that Mr. Schmidt noticed Officer Escobedo watching him quite often. Mr. Schmidt was careful not to break any rules and had no history of any disciplinary action; however, Officer Escobedo continued to closely supervise Mr. Schmidt.  Officer Escobedo immediately began grooming Mr. Schmidt by interacting with him in various unorthodox ways, for example 1) locking the gate each time Mr. Schmidt would try to get in or out in a manner that was not normal; 2) calling him to the "bubble", the Officers' main station, to ask him random personal questions, and 3) Officer Escobedo would command Mr. Schmidt not to leave when he would try to walk away from any situation where Officer Escobedo would entrap him.

 4.2    Officer Escobedo would often tell Mr. Schmidt that he had to wait at the bubble, in violation of ISCI policy and procedure, during yard movement, so as to hide his grooming of Mr. Schmidt from others.

4.3    From May 2012 until the first physical assault in August 2012, Mr. Schmidt would see Officer Escobedo watching him wherever he was. Officer Escobedo had the ability to stalk Mr. Schmidt. Officer Escobedo was considered a "roaming officer." Officer Escobedo again took advantage of his power and position as he began stalking Mr. Schmidt.  If Mr. Schmidt was at the dining hall, Officer Escobedo would be there, if he was in medical, Officer Escobedo would be there, if he was at recreation, Officer Escobedo would be there.

4.4    Officer Escobedo acts became bolder and more brazen, escalating to voyeurism where Mr. Schmidt was concerned; for example, in late August 2012, Mr. Schmidt recalls showering in the Unit 13 bathroom and as he reached out to get a towel he saw Officer Escobedo watching him while in the shower. Mr. Schmidt was so shocked he stepped back into the shower stall and froze.  When he could, he grabbed his clothes and ran out the door, dressing as he was fleeing.

4.5    Shortly after the voyeurism incident Officer Escobedo committed his first of many sexual assaults against Mr. Schmidt.  Mr. Schmidt was just outside the unit door for yard movement when he was stopped by Officer Escobedo who claimed he needed to do a contraband search.  While Officer Escobedo was searching, he grabbed Mr. Schmidt's genitals (first over the clothes) and while groping Mr. Schmidt's genitals asked in clear violation of PREA- "How big does it get?".  Mr. Schmidt did not answer.  When Officer Escobedo put his bare hand (no gloves) in the waistband of Mr. Schmidt's pants and started to go down the front toward his bare penis Mr. Schmidt squirmed away. Mr. Schmidt feared reprisal if he reported anything.  He feared not only Officer Escobedo but began wondering about other Correctional Officers since no one seemed to care what

Officer Escobedo was doing. Mr. Schmidt personally observed that Correctional Officer's have an understanding and practice of rallying against the prisoners whenever there is a prisoner allegation of correctional wrongdoing. It appeared to Mr. Schmidt at this point that Defendant Correctional Officer Tramel was particularly supportive of Officer Escobedo. Mr. Schmidt worried that they would team up against him so he did not want to report anything or seem like he noticed any Correctional Officer doing anything wrong.

4.6     Officer Escobedo's sexual assaults increased in frequency and forcefulness. Mr. Schmidt again became a victim of sexual assault by Officer Escobedo about one week later (early September 2012). Officer Escobedo called him out of his cell to allegedly have him help with cleaning the air vents in the office of Unit 13-C-2. Officer Schmidt promised Mr. Schmidt that he would put some good "C-Notes" in his file if he would come help.

4.7     C-Notes are a confidential record kept on offenders by prison staff. The only persons outside of the Idaho Department of Corrections allowed to view these records are staff from the Idaho Commission of Pardons and Parole. C-Notes can be very helpful and persuasive to the Idaho Commission of Pardons and Parole and to IDOC when making determinations regarding an offenders incarceration status. Generally, offenders are not permitted to see his or her C-Notes. It is common for Correctional Officers to use this tool to their advantage, often displaying would be C-Notes to offenders to gain persuasive favor over inmates.

4.8     Reluctantly Mr. Schmidt agreed to help. During the course of this cleaning assignment Officer Escobedo would get closer and closer to Mr. Schmidt and use every

opportunity to brush up against him. At one point Officer Escobedo grabbed the vacuum hose that Mr. Schmidt was using and sexually assaulted Mr. Schmidt by pressing it up against Mr. Schmidt genitals. This happened several times during this cleaning session. Mr. Schmidt felt violated, awkward and afraid. He risked a "DOR", electing to go to a pill call in order to extricate himself from the situation. A "DOR" is a sanction that Correctional Officer's give to offenders for many reasons including, "being in an unauthorized area."

4.9    Officer Escobedo's next sexual assault occurred when he came to Mr. Schmidt and asked him if he would help one of the electrical contractors with the wiring in the D-2 area of Unit 13. Mr. Schmidt did not want to go with Officer Escobedo. However, Officer Escobedo ordered Mr. Schmidt to go with him. While helping with the wiring Officer Escobedo would get very close to Mr. Schmidt and used every occasion he could to shove his knee into Mr. Schmidt's genitals. As Mr. Schmidt would move away Officer Escobedo would move closer. At one point Mr. Schmidt announced that he was through with helping and was going to gym. Officer Escobedo was close enough and in a soft voice said "Why are you so resistant".

4.10    The next sexual assaults by Officer Escobedo happened later in September 2012. Officer Escobedo called Mr. Schmidt to the office of Unit 13 after 9:00 p.m., which is uncommon. Officer Escobedo ordered Mr. Schmidt to start regularly cleaning the staff office. Again, Officer Escobedo promised Mr. Schmidt good "C-Notes." Mr. Schmidt with orders and a possible C-Notes entry warily began the regular task. Every time Mr. Schmidt cleaned the staff office, Officer Escobedo would use the occasion to sexually assault Mr. Schmidt in some form or another. Officer Escobedo would sometimes

perform a pat search with extended hand to genital over the clothes contact. Or, Officer Escobedo would search the waistband of Mr. Schmidt's pants and reach far enough down in the front to touch the bare head of his penis. Or sometimes Officer Escobedo would do both.

4.11    Officer Escobedo continued to use his position of authority to exercise control and groom Mr. Schmidt.

4.12    Officer Escobedo's sexual assaults became more aggressive to the point where Officer Escobedo was forcing Mr. Schmidt to allow him to perform oral sex on Mr. Schmidt and/ or Mr. Schmidt was forced to perform oral sex on Officer Escobedo.

4.13    Officer Escobedo's sexual harassment and assaults continued from April 2012 until he was terminated from his employment.  Throughout his time at ISCI Officer Escobedo assaulted Mr. Schmidt on a regular basis.

4.14     Mr. Schmidt estimates that every day that Officer Escobedo worked he would seek Mr. Schmidt out and at some point during the day would assault him either with pat down search to include the touching of his genitals or a complete oral sex assault.

4.15    Mr. Schmidt began distancing himself from his family because he was too embarrassed to tell them what was happening and he was too afraid of reprisal to tell anyone in the Institution about the assaults.

4.16    Mr. Schmidt began losing sleep and was often sick to his stomach, became depressed and even contemplated harming himself to get away from Officer Escobedo's sexual assaults.

4.17    Mr. Schmidt suffers the ridicule of other correctional officers and inmates. He is called a "faggot" now by other offenders who know about this situation and he is constantly defending himself.

4.18.    Mr. Schmidt has been placed in the most restrictive housing residence and although is now considered a minimum point custody prisoner, still is not allowed to move to the Institutions where minimum custody prisoners are housed.  He is told it is because of the "conflict" at ISCI (with Officer Escobedo), as if to accuse him of the wrongdoing.

4.19    Mr. Schmidt has suffered physical and psychological damage, pain and suffering, and continues to struggle daily for his own safety in an environment where if you "snitch" on even a Correctional Officer, you can be in danger.

4.20    Plaintiff Jess Tronson is a 27 year-old male.  Mr. Tronson was the assigned cellmate of Plaintiff Schmidt beginning in or around September 17, 2012.  On September 17, 2012, Mr. Tronson's first encounter with Officer Escobedo, he witnessed Officer Escobedo throwing a rock at the window of their cell 56A-Unit 15.  Mr. Schmidt told Mr. Tronson that Officer Escobedo did things like that "all of the time."  From that day on Mr. Tronson began paying close attention to Officer Escobedo.

4.21    On September 18, 2012, when Mr. Tronson returned to his cell after a day of work he witnessed Officer Escobedo in his cell with Plaintiff Schmidt.  As he walked into the cell, Officer Escobedo yelled at him to "get out!" and then ordered him to make sure no one else came into the cell.  Mr. Tronson didn't understand at that time why Officer Escobedo was being so aggressive. When he was allowed to come back into his cell that

night, he asked Mr. Schmidt what that was all about and Mr. Schmidt told him, "I don't want to talk about it."

4.22.    From that day on Mr. Tronson witnessed Officer Escobedo in his cell every day as he was returning from work for ISCI. Officer Escobedo became more and more aggressive toward Mr. Tronson over the weeks that followed.   There were additional times when he ordered Mr. Tronson to remain as "look out" outside of his cell while he was alone in the cell with Mr. Schmidt.

4.23.    There were numerous occasions when Mr. Tronson would walk into his cell, not knowing anyone was in there and would see Officer Escobedo with his back to the door and face down toward Mr. Schmidt's genital area performing what appeared to be oral sex movements on Mr. Schmidt. This was the beginning of Mr. Tronson's intimidation and assault at the hands of Officer Escobedo.

4.24.    On or about October 31, 2012, Officer Escobedo approached Mr. Tronson and ordered him to help with cleaning a "catwalk" area outside of Unit 15.  The place he wanted Mr. Tronson to clean is an area where normally inmates are not allowed. Because of how Mr. Tronson knew Officer Escobedo to be with Mr. Schmidt, he asked another inmate, Patrick Bailey to join him and Officer Escobedo permitted Inmate Bailey to come along.   Upon entering the catwalk area Mr. Tronson saw an HVAC contractor standing there and purposely asked him what was going on to stall for time.   The contractor told him he was repairing the HVAC system. Officer Escobedo then told Inmate Bailey to wait by the door while he took Mr. Tronson to go clean whatever the mess was.  Once they were alone Officer Escobedo began asking Mr. Tronson if he was going to tell on him and reminded him that if he did he could make his life miserable.

Officer Escobedo then began interrogating Mr. Tronson about Mr. Schmidt. Officer Escobedo asked personal, informative questions, such as, who does Mr. Schmidt hang out with; who does he call on the phone; and if he has ever told him anything going on. Mr. Tronson told Officer Escobedo he didn't know anything about Mr. Schmidt and denied knowing about anything going on.

4.25.   At that point Officer Escobedo began making advances on Mr. Tronson and started asking him if he had ever been with a man. As he came closer Officer Escobedo put his hands on Mr. Tronson and began rubbing his chest. Mr. Tronson froze with fear. He said in his mind he wanted to hit Officer Escobedo. Knowing that hitting a Correctional Officer could be a felony, he held back and asked Officer Escobedo to please stop touching him. At that point Officer Escobedo put his hand on Mr. Tronson's penis (over his pants) and attempted to get him aroused. A few minutes into this sexual activity, which had been about 20 minutes since leaving Offender Bailey, Offender Bailey yelled that he didn't want to be up there in the catwalk any longer. His yell appeared to scare Officer Escobedo and so he stopped touching Mr. Tronson. Officer Escobedo then told Mr. Tronson that his "life will be miserable" if he dared to tell anyone what he just did. Mr. Tronson felt embarrassed and ashamed but agreed not to tell anyone. He did eventually tell Offender Bailey what had occurred. From that point on Mr. Tronson experienced extreme stress. He didn't know what to do about what he knew was going on not to mention what happened to him. He feared Officer Escobedo and knew he had the authority and power via his position and the support of other Correctional Officers to make good on his threats. This was the first sexual assault of Jess Tronson by Officer Escobedo

4.26     During the second week of November 2012, again when Mr. Tronson came back to his cell from work, he opened his cell door and witnessed Officer Escobedo performing oral sex on Mr. Schmidt. Officer Escobedo jumped up and walked into the hallway where he threatened Mr. Tronson with losing his job or being sent to segregation if he told anyone what he had just seen.

4.27     About the third week of November 2012 Officer Escobedo approached Mr. Tronson and told him that he was going to have Mr. Schmidt help Tronson with cleaning the counselor's office.  Mr. Tronson told him that he didn't need any help because he has always been able to complete the job alone. Officer Escobedo said very aggressively "he's going to help you."  Mr. Tronson said "whatever" and they all walked into the area to clean.  Mr. Schmidt began cleaning in one area and Mr. Tronson in another.  As the lead custodian, Mr. Tronson would check from time to time to make sure everyone was doing their job.  He did so this night and verified that all areas were cleaned.  At 9:00 p.m. all Offenders are required to return to their cell area for count time.  After count, Officer Escobedo came to the cell and ordered Mr. Schmidt to return to the counselor office area to continue cleaning.  Mr. Tronson spoke up and told Officer Escobedo that the work was done and that he didn't need to go back.  Officer Escobedo then ordered Mr. Schmidt to accompany him back to the office area.  Mr. Tronson left the cell to visit with other offenders.  Around 10:15 p.m, which is the time all offenders have to cell up for the evening, also known as "lockdown" time, Officer Whey followed Mr. Tronson to his cell.  When Mr. Tronson approached his cell door, Officer Whey witnessed Officer Escobedo leaving the cell with the lights already off.  Mr. Schmidt was in the cell.

Tronson believes that Officer Whey eventually filed a report with the investigations section of IDOC concerning his suspicions of Officer Escobedo's activities.

4.28.    A few days later an investigation was started into Officer Escobedo's behavior. Neither Offenders Tronson nor Schmidt felt safe enough to report what was going on or to initially cooperate with the investigation until they could be assured that Officer Escobedo would be removed and unable to further assault them or tamper with their C-Notes.

4.29.    After being assured by Sgt Trobeck that no Correctional Officer would retaliate if Mr. Tronson cooperated with the authorities, he agreed to disclose what he experienced or/and witnessed.  Shortly after that he heard Correctional Officer Whey reporting to another Correctional Officer that he thought Mr. Tronson was a homosexual and that he thinks Mr. Tronson, Mr. Schmidt and Officer Escobedo were having a "3-way" from time to time.  Mr. Tronson finally spoke to a Brooke Olson, a nurse at the facility about this. He was told that IDOC will "deal" with it.

4.30.    Since cooperating with IDOC, and particularly since reporting by Officer Whey, Mr. Tronson has been routinely intimidated by being placed on transfer lists to be moved to ICC, which is a private prison known for inmate fights and gang activity.  Mr. Tronson has on his file specific security issues with being placed at ICC and that information is well documented in his IDOC file.  He took the threats to move him there very seriously. On January 3, 2014, Mr. Tronson was indeed moved to the ICC facility.  He is terrified daily.  He is reluctant to get further involved in assisting with this case or the criminal prosecution of Officer Escobedo, but will testify honestly when called to do so.

4.31.    Plaintiff Ignacio Tellez is a 22-year old male.  At all times during the course of the misconduct alleged in this complaint, he was housed as a prisoner at the ISCI facility under IDOC care, custody and control.  Mr. Tellez was housed in 15-house in cell 54 from March 7, 2012 to October 11, 2012.  Jeremiah Schmidt moved into 15-house cell 56 with Mr. Tellez' friend Jess Tronson in Sept. 2012.  Mr. Tellez and Mr. Tronson were friends.

4.32.    Mr. Tellez would regularly come in and out of Mr. Tronson's cell when visiting there.   Mr. Tellez started noticing Officer Escobedo following Mr. Schmidt around, harassing him, and calling him out to do a lot of special duties.  One day Mr. Tellez walked into cell 56 and saw Officer Escobedo "all over" Mr. Schmidt.  It appeared to Mr. Tellez as if Mr. Schmidt was pulling up his pants.  Officer Escobedo looked at Mr. Tellez at which time Mr. Tellez said "my bad" and walked out closing the door behind him. Officer Escobedo chased after Mr. Tellez and asked "what were you doing?"  Officer Escobedo then threatened Mr. Tellez, stating, "I should give you a D.O.R. for entering somebody else's cell."  Mr. Tellez told Officer Escobedo that if he did that he would call investigations at which point Officer Escobedo threatened Mr. Tellez telling him he would "take you to 8 house" which is the "hole" also known as segregation. Officer Escobedo then started telling Mr. Tellez about his own family and how he was "gang" connected via East Side BMC Sur 13 and knew the "SouthSiders" at ISCI and named a few to prove that he knew them.  This was in an effort to further intimidate Mr. Tellez to keep him from reporting anything he saw.

4.33.    A few days later Officer Escobedo pulled Mr. Tellez over for a search and asked him if one of the SouthSiders had "talked to him."  Officer Escobedo then threatened to

PRISONERS VERIFIED CIVIL RIGHTS COMPLAINT, JURY TRIAL, ADR          14
REQUESTED

have Tellez' parole release date taken if he said anything. He then began to stick his hand down Mr. Tellez' pants and grabbed his genitals at which time Mr. Tellez stepped back and said "What the fuck man?" and Officer Escobedo replied "oops" as if he touched him accidentally. This was the first of Officer Escobedo's sexual assaults on Mr. Tellez.

4.34.    There were other encounters where Officer Escobedo threatened Mr. Tellez about losing his parole date or taking him to "the hole" or even having someone "take care of him" meaning a gang member hurt him in some way.

4.35.    One time a friend, or "homie" of Mr. Tellez named "M" pulled him aside and told him to not give Officer Escobedo a hard time and to leave what he had seen alone. When Tellez asked "M" why he wanted him to let this go, M told him that Officer Escobedo was about to "get something going" for the "homies" and to quit "fucking it up."

4.36.    After the above occurrence, Officer Escobedo was very friendly to Mr. Tellez. When Mr. Tellez told Officer Escobedo, "I don't play that faggot shit" he started being particularly aggressive during his searches and would pinch Tellez' butt and go through his address book. Mr. Tellez finally told Officer Escobedo that he would not say anything and to just leave him alone.

4.37.    Things calmed down for a period of time between Officer Escobedo and Mr. Tellez, but Mr. Tellez continued to see Officer Escobedo in the cell 56 or at different locations in the institution always with or around Mr. Schmidt.

4.38.    In October 2012, Mr. Tellez was in the gym at ISCI and Officer Escobedo came up to him and asked if "M" was getting out today. Mr. Tellez told him he thought so and Officer Escobedo told Mr. Tellez to tell "M" that he offered to give him a ride if he

needed it because he would no longer be IDOC property he would be "his" property. Tellez interpreted this gesture as a threat to "M" to be quiet once he got out about anything he might know going on. Officer Escobedo also took the opportunity to tell Mr. Tellez that when he was released to parole he would like to give "his fine young ass" a ride home if he needed one. Mr. Tellez didn't say anything more to Officer Escobedo about anything because he was being transferred to SICI and didn't want the hassles or a DOR to stop him from getting transferred. Mr. Tellez knew that Officer Escobedo had the power to interfere with his housing transfer process.

4.39. In June 2013, Mr. Tellez was being transferred back to ISCI, which he was dreading because of Officer Escobedo. When he got there he learned that Officer Escobedo was gone and he was relieved. His friend, Jess Tronson, approached him as did Jeremiah Schmidt and told him it was safe to go ahead and report what Officer Escobedo was doing to him as he was gone now. Mr. Tellez still resisted because he didn't want to be a "rat."

4.40. In prison a "rat aka snitch" is a person who tells on others, even if the others are the Correctional Officers. As time went on he thought about it more and decided he needed to tell what Officer Escobedo had been doing to him and that way it might prevent this from happening in the future. And if there were more victims they might come forward knowing about other men in the same situation.

## V. STATEMENT OF CLAIMS

### A. General Allegations

5.1 The Eighth Amendment to the Constitution prohibits the imposition of "cruel and unusual punishments." It follows that prisons have a duty to protect prisoners from sexual

assault at the hands of a Correctional Officers. *Schwenk V. Hartford* 204 F3d 1187 (9th Cir. 2000)

5.2     The Supreme Court and the Ninth Circuit have made it clear that prisons violate the Eighth Amendment rights of prisoners both when they *undertake an act* that places a prisoner at substantial risk of serious harm and when they *fail to act* to abate such a risk. "Thus, violations of the Eighth Amendment may occur as 'a result of either a prison official's act *or omission*.' *Farmer [v. Brennan]*, 511 U.S. [825], 834 [1994]." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (emphasis supplied in *Clem*).

5.3     A jury may assess punitive damages if the defendant is either (a) motivated by evil intent; or (b) acts with recklessness or callous indifference toward the federally protected rights of others. *See Smith v. Wade*, 461 U.S. 30, 55 (1983).

5.4 The specific and deliberate actions of Officer Roberto Escobedo meet with the Cruel and Unusual punishment standard, and violated the protected rights of the plaintiffs.

### *B. IDOC's Deliberate, Reckless and Callous Indifference*

5.5     Plaintiffs incorporate all prior paragraphs of this Complaint, and the attachments hereto and further allege as follows:

5.6     IDOC is deliberately, recklessly, and callously indifferent to prisoner health and safety.

5.7     IDOC did not nor do they comply with the standards set down in the Prisoners Rape Elimination Act.   Although they have collected Federal Funds to be in compliance, they are not.

### C. FIRST CLAIM FOR RELIEF

5.8     Plaintiffs repeat and re-allege each of the allegations set forth in the preceding

Paragraphs as if set forth in full herein.

5.9     Based on the facts set forth above, Plaintiffs Schmidt, Tronson and Tellez assert

that IDOC failed to protect them, which resulted in a violation of rights secured to them

by the Eighth and Fourteenth Amendments to the U.S. Constitution and the Prisoner

Rape Elimination Act. Plaintiffs seek injunctive, compensatory and punitive damages

against the Defendants pursuant to 42 U.S.C § 1983.

### D. CLAIM FOR REASONABLE COSTS AND ATTORNEY FEES

Plaintiffs include a claim for costs and reasonable attorney fees available to them and

pursuant to 42 U.S.C § 1983.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully pray that this Honorable Court will:

1.      Grant Plaintiffs, pursuant to 42 U.S.C. § 1983, compensatory damages against

defendant IDOC, and all Defendants individually and separately in an amount, as the

proof will show at trial.

2.      Grant Plaintiffs, pursuant to 42 U.S.C. § 1983, punitive damages against

Defendant IDOC, and all Defendants individually and separately in the amount sufficient

to punish and discourage IDOC, all Defendants and other similarly situated persons and

entities from engaging in this type of reprehensible conduct in the future.

3.      Grant injunctive relief, in the form of mandating compliance with the Prison Rape

Elimination Act and an accounting of past and present Federal Funding paid to IDOC

where the funding was used and for what the funding was used.  And, that IDOC allow

and compensate an independent overseer to randomly investigate and assure that IDOC is in compliance with the PREA act.

4.      Grant such additional and further relief, including injunctive relief and an award of attorney fees and costs, as the Court may deem proper under the circumstances.

A JURY TRIAL IS REQUESTED ON ALL CLAIMS SO TRIABLE.

By and through counsel of record

DATED this 13th day of June, 2014.

                                       _____//s// Ryan T. Earl
                                       Ryan T. Earl
                                       Attorney for Plaintiffs

**VERIFICATION**

State of Idaho        )
ss                    )
County of Ada         )


I, _____, have reviewed the above complaint and find it to be accurate to the best of my knowledge:


DATED _____        _____
                                  Jeremiah Schmidt, Plaintiff


State of Idaho        )
ss                    )
County of Ada         )

I, _____, have reviewed the above complaint and find it to be accurate to the best of my knowledge:


DATED _____        _____
                                  Jess Tronson, Plaintiff


State of Idaho        )
ss                    )
County of Ada         )


I, _____, have reviewed the above complaint and find it to be accurate to the best of my knowledge:


DATED _____        _____
                                  Ignacio Tellez,  Plaintiff




Schmidt signed and sworn to before me this _____ day of June, 2014

PRISONERS VERIFIED CIVIL RIGHTS COMPLAINT, JURY TRIAL, ADR        20
REQUESTED

Tronson signed and sworn to before me this _____day of June, 2014.

Tellez signed and sworn to before me this _____day of June ,2014.

_____
Notary Public Idaho
My Commission Expires